**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

James M. Smolinsky

         v.                              Civil No. 08-cv-210-JD

Michael J. Astrue, Commissioner,
Social Security Administration


### REPORT AND RECOMMENDATION

Currently before the court for a recommendation of
disposition is an appeal from a November 2007 decision by the
Commissioner of the Social Security Administration ("SSA")
denying claimant James M. Smolinsky's application for benefits.
See 42 U.S.C. § 405(g) (Supp. 2008) (providing for district court
review of final decisions of the SSA); see also 28 U.S.C. §
636(b)(1)(B).  Plaintiff has filed a Motion to Reverse (document
no. 7) and defendant has filed a Motion to Affirm (document no.
8).  The parties submitted a Joint Statement of Material Facts
(document no. 9) ("J.S."), and both parties objected to the other
party's filings (document nos. 11 & 12).  For the reasons set
forth below, I recommend that the decision of the SSA be
affirmed.

<u>Background</u>[1]

1.  <u>Procedural History</u>

Claimant first filed for Child Insurance Benefits ("CIB") and Supplemental Security Income ("SSI") on June 8, 2006, because he no longer qualified for the benefits he had been receiving as a child on account of his father's disability.  He claimed he was disabled because of abdominal problems and mental health issues and represented the onset date of his disabilities as September 1, 2005.  The applications were initially denied on September 29, 2006, after which claimant requested a hearing.  One year later, on September 18, 2007, a hearing was held, at which claimant appeared with counsel and testified.  On November 30, 2007, an administrative law judge ("ALJ") determined that claimant had not been disabled since the alleged September 1, 2005 onset date and had a residual functional capacity to perform several jobs.  At that time, claimant was 19 years old, with a general equivalency diploma ("GED") but no further education or training.  Claimant appealed the denial of benefits, which was affirmed on March 28, 2008.  As the final order of the SSA, the matter is now properly before this court for review.  <u>See</u> 42 U.S.C. § 405(g).

---

[1]The parties submitted a "Joint Statement of Facts" (document no. 9), on which this background account is based.

## 2.  Medical History

In May 1998, when claimant was 10 years old, he had an appendectomy.  He suffered complications from the surgery, which required additional surgery in June 1998 to repair abdominal abscesses and obstructing small bowel adhesions and to treat a wound infection.  The record does not indicate that claimant missed school or was otherwise restricted for any extended period of time because of the abdominal complications until four years later, at the beginning of the 2002-03 school year, when claimant was 14 and presumably starting ninth grade.  In September 2002, he missed 10 of 18 days of school and then withdrew for the year.

The next year, in 2003-04, claimant attended school for 93 days and missed school 83 days.  In December 2003, claimant was admitted to the hospital because of abdominal pain and vomiting. He was diagnosed with a small bowel obstruction, treated intravenously and released two days later.  A month later, in January 2004, claimant went to Dr. John Bentwood, complaining again of abdominal pain.  He received a "computed tomography (CT) scan" to look for abnormalities in the abdomen and pelvis, which appeared normal.  Dr. Bentwood concluded claimant had a partial small bowel obstruction and recommended he eat a restricted diet

3

and avoid nondigestable foods.

In March 2004, claimant saw Dr. Susan Edwards for further care of his lower abdominal pain.  Claimant had not been eating much and had lost 30 pounds, which placed him in the 75th percentile for his height and weight.  Claimant also told Dr. Edwards that he felt anxiety about social issues, was slightly depressed and lethargic.  Dr. Edwards attributed the weight loss to claimant's anxiety over the bowel obstruction and self-imposed decreased food intake.  She concluded that claimant may have had an adhesion or stricture that self-corrected, and she encouraged him to eat more, specifically two instant breakfasts a day.

In April 2004, claimant went back to the doctor complaining of nausea and vomiting for six days.  He also had chills, a fever and a headache.  Claimant was seen by a nurse practitioner, Anita Reid.  NP Reid determined his gastrointestinal exam was normal, that there was no correlation between his symptoms and his diet, and she recommended that he rest and follow a clear liquid diet for 12 hours.  She also noted claimant appeared tired.

On May 18, 2004, claimant saw Dr. John Jehl as an outpatient at the hospital for his psychological problems.  Dr. Jehl questioned claimant, his mother interrupted with the answers and

stated that she wanted claimant out of school until they could see NP Reid again. Claimant told Dr. Jehl he felt overwhelmingly tired and moved slowly but that his pulse was fast. Dr. Jehl's examination found claimant to have a normal pulse, at 72 beats per minute, and to be alert, oriented and cooperative but with a flat affect. Claimant was taking an anti-depressant at that time, but reported not feeling any effect positively or negatively from the drug. Dr. Jehl concluded that claimant had anxiety and depression and perhaps other issues which claimant clearly did not want to discuss at that time. Claimant requested a doctor's order to remain out of school, which Dr. Jehl granted.

A week later, on May 27, 2004, claimant returned to NP Reid. Her observations of claimant were identical to Dr. Jehl's notes: alert, oriented and cooperative, again with a flat affect. She concluded that claimant's anxiety and depression were the same as they had been and advised him to return if his condition worsened and to return in two months for a routine follow-up.

Claimant went back to Dr. Bentwood in June 2004 to check on his small bowel obstruction. He had gained weight and reported feeling better. Dr. Bentwood advised claimant to continue with a restricted diet, in particular avoiding nondigestable foods.

In July 2004, claimant visited Dr. Andrew Connery for a psychological evaluation.  Dr. Connery reviewed claimant's complete medical file and administered a battery of tests. Claimant tested very well, demonstrating average and above average intelligence, excellent reading skills, clear writing, and no problems with confusion or distractability.  His test answers reflected a good sense of accomplishment and productivity and an ability to work intensely for periods of time.  He also indicated that he enjoyed sports and writing stories.

Claimant did exhibit some signs of depression, including thought and sleep problems.  Dr. Connery noted the sleep problems may have been contributing to or resulting from claimant's distress.  Answers to other test questions revealed that claimant felt anxiety while at school and felt more relaxed at home and with males.  The results indicated that claimant perceived himself as having mental difficulties, that he feared dying, and that he was concerned about his mother's multiple sclerosis. Claimant identified himself as "moody/irritable" and admitted he was concerned about his "career goals."  Test results characterized him as being depressed, fearful, socially anxious, self-pitying and pessimistic.  The test results also indicated,

6

however, that he perceived these characteristics as engendering sympathy and hoped they would elicit supportive and protective responses from those around him.

Claimant's mother was also interviewed.  She stated she thought her son was generally healthy, but wanted counseling for his depression and anxiety.  Claimant's mother believed that the small bowel problems had caused emotional problems for her son and that, since the December 2003 hospitalization in particular, claimant's mood had declined sharply.  She noted that he had received four counseling sessions after his December 2003 surgery, but then was simply prescribed the anti-depressant, Lexapro, by NP Reid.  She was concerned that because he had missed so much school that year, he would be unable to pass to the next grade.  She believed his problems with school were caused by his anxiety, disorganization and peer pressure.  She also felt he had low energy and poor concentration, and that he was unable to sleep because of anxiety.  She stated he did have good relationships with some friends and his family.  She reported claimant worked part-time, played his guitar, spent time on the computer and enjoyed fishing, wrestling and cars.

Unlike his mother, claimant did not think his emotional

problems were caused by his small bowel difficulties, but instead said that he was frightened by the amount of illegal drugs used at school.  He also stated he was upset that he had been corrected in his driver's education class, and he admitted that he fought with peers outside of school.  He wanted to finish high school either by being home schooled or earning his GED, and then attend college.  Claimant said he enjoyed history, politics and sociology and often read on his own.

Dr. Connery concluded that claimant had a generalized anxiety disorder, insomnia related to that disorder, and mixed personality traits, including avoidance and depressive traits. He advised claimant to begin psychotherapy.  He also recommended claimant visit a nearby college to alleviate his school-related anxiety.

The record indicates claimant next sought medical care 18 months later, when he visited NP Reid for an annual physical examination in February 2006.  His height and weight were normal, and he exhibited no signs and expressed no complaints of any physical or psychiatric problems.  He was living at home with his parents and siblings, and his hobbies included playing the guitar and wrestling.  He denied smoking, drinking or illicit substance

usage.  Although claimant had recently had an upper respiratory infection, he was healthy, with normal affect and demeanor.

In April 2006, claimant went to the hospital again, twice, for abdominal pain, cramping, bloating and vomiting.  He was admitted for testing, and x-rays showed a partial small bowel obstruction.  Dr. Alex Medlicott diagnosed an intermittent partial small bowel obstruction due to adhesions, and admitted claimant for the day for intravenous therapy.  The next day claimant returned to the hospital with the same symptoms.  Dr. Joseph Casey operated on claimant to remove adhesions and close a leak in his small intestines.  Although claimant initially did well postoperatively, he began to suffer from abdominal distention and had to have another surgery, this time performed by Dr. Bentwood, to remove a segment of his small intestine. Following the second surgery, claimant reported feeling well, and Dr. Bentwood assessed that his condition had improved.  After this second surgery, claimant resumed his same life-style.  He lived at home, spent time with his younger brother, and occupied himself with the computer and television.

In July 2006, as part of his June 2006 application for SSI benefits, claimant reported that he could not socialize with

others or eat normally because of his intestinal problems, and reported that his sleep problems persisted.  He explained that he did little housework or yard work because it aggravated his stomach problems.  Claimant was able to drive, shop in stores and walk for five to ten minutes at a time.  He described himself as having difficulty concentrating and following instructions, as not getting along well with authority figures, and has having difficulty handling stress or changes in routine.  He also said, however, that he did not have any difficulty getting along with others and simply preferred not to socialize.

In August 2006, claimant went back to NP Reid because of problems with anxiety and depression.  He explained feeling manic and depressed, approximately 50% of the time, but during the office visit he felt normal.  When he was symptomatic, the problems persisted for approximately a week and interfered with his daily activities.  He had no suicidal tendencies.  He told NP Reid he had been traumatized by his past surgeries and the health complications from his medical problems.  He also told NP Reid he was not currently under any psychiatric care.  NP Reid observed claimant to be physically healthy and normal.  He had an appropriate affect and demeanor, with normal speech and memory

but she referred claimant to a psychologist, Dr. Vincent Scalese, for further treatment of his anxiety and depressive disorder.

Claimant saw Dr. Scalese in September 2006.  He reported an eight year history of a moderately severe adjustment disorder, with mixed anxiety and depression.  Claimant told Dr. Scalese that his abdominal problems were stable, and he was at a point to make a decision about work and further education.  He explained to Dr. Scalese that he had dropped out of high school at age 16 because of social problems, but had earned his GED and wanted to attend college.  He had a girlfriend although his social contacts were limited.  He still enjoyed spending time on the computer, fishing, reading and playing video games.

Dr. Scalese examined claimant and determined that he was quite healthy.  He had normal appearance and speech, appropriate affect, good cognitive functioning and good psychological insight.  He had no suicidal or homicidal ideation, and reported that he had not abused any alcohol or drugs in the past two years.  Dr. Scalese rated claimant as being only moderately impaired in his social, occupational and school functioning, and assessed claimant as having an adjustment disorder with mixed anxiety and a depressed mood.  Dr. Scalese noted that claimant

did not want to continue with behavioral therapy and told him that he could cope with life, had plans to meet with an academic adviser at a local college, and would call if he felt it was necessary.

In connection with his pending application for SSI benefits, the state SSI benefits administrator referred claimant to a consulting psychologist, Dr. Rexford Burnette, for an adult "Comprehensive Psychological Profile." Dr. Burnette noted that claimant complained of the same symptoms of periodic anxiety, depression and mood swings, which persisted for about a week when they occurred. Claimant told Dr. Burnette that he had been traumatized by his earlier abdominal surgeries and continued to be distressed by related stomach pains, nightmares and insomnia. He explained his irregular sleep was partially caused by his irritable bowel syndrome. Claimant attributed his inability to focus or concentrate on the stomach-related distress, and also admitted to having had suicidal thoughts and having dabbled in substance abuse, previously but not presently. Claimant also told Dr. Burnette he was not presently receiving any mental health care, in the form of medication or counseling. Claimant described his activities as including watching television and

playing video games, working out, driving, shopping and assisting
with domestic chores.  He also described himself as being
socially limited, but was less anxious in social situations than
when he was younger.  Claimant said he got along well with his
family, but admitted he still had difficulties with peers and in
some job situations.  Claimant said he still avoided certain
foods that were difficult to digest, but had gained twenty pounds
recently and was healthy.

Dr. Burnette assessed claimant as being cooperative and
cordial, with normal speech and appropriate affect.  Though he
was somewhat focused on his abdominal problems, claimant was not
obsessed with them.  His memory was good, and claimant had no
impairment with comprehension, concentration or task completion.
Dr. Burnette did not discern any problems with work or work-like
situations.  He noted that claimant could perform all "ADLs," or
activities of daily life, independently.  Dr. Burnette noted a
need to "rule out" claimant suffering from a conduct disorder, an
unspecified substance abuse or a depressive disorder.

Also in September 2006, the SSA had a state agency
psychologist, Michael Schneider, and a state agency physician,
Jonathan Jaffe, review claimant's record, although they did not

examine claimant.  Dr. Schneider concluded claimant had no medically determinable mental impairment.  Dr. Jaffe concluded claimant had no physical limitations or environmental restrictions.

Claimant next sought medical care on January 24, 2007, when he went to the hospital again complaining of abdominal pain and vomiting.  After receiving a liter of fluids, claimant felt better and chose not to be admitted.  His treating physician, Dr. James Kelsey, noted that claimant might have a bowel obstruction and advised him to return if his symptoms persisted and to limit his diet to clear fluids until he felt better.

The record contains no further evidence of medical care received before claimant's September 18, 2007 SSI hearing.  At the hearing, claimant testified that he had quit his job because his abdominal problems prevented him from reporting to work on time.  He testified that his intestinal obstruction would cause a blockage that would make him feel nauseous and then make him vomit, requiring him to wait for some period of time without eating or drinking to enable his system to quiet and the blockage to clear.  Claimant stated this occurred several times a week and could impede his activities for as much as a full day.  The last

14

time it had persisted for the entire day claimant had gone to the emergency room, in January 2007.  Claimant did not know of any medical care he could receive to cure this problem.  Finally, claimant explained that, since finishing high school, he had not looked seriously for work because of his stomach problems and the impact it had on his daily life.

### 3.  The ALJ's Decision

After considering all the evidence, the ALJ first determined that claimant had not engaged in substantial gainful activity since the alleged September 1, 2005 onset date.  See 20 C.F.R. §§ 404.1520 & 416.920.  The ALJ concluded that claimant did have a severe impairment in the form of his small bowel obstruction, but that this impairment did not meet or equal a listed impairment under Appendix 1, Subpart P of the Social Security Regulations No. 4.  The ALJ then concluded that claimant retained the residual functional capacity ("RFC") to perform a full range of light work.  Despite claimant not having past relevant work experience, the ALJ found claimant could perform a significant number of other jobs in the national economy, rendering him not disabled within the meaning of the Social Security Act and, therefore, ineligible for disability benefits.

Discussion

1.  Standard of Review

Claimant has a right to judicial review of the decision to deny his social security benefits.  See 42 U.S.C. § 405(g) (Supp. 2008).  The court is empowered to affirm, modify, reverse or remand the decision of the Commissioner, based upon the pleadings and transcript of the record.  See id.  The factual findings of the Commissioner shall be conclusive, however, so long as they are supported by "substantial evidence" in the record.  See Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).  "Substantial evidence" is "'more than a mere scintilla.  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Currier v. Sec'y of HHS, 612 F.2d 594, 597 (1st Cir. 1980).  The Commissioner is responsible for resolving issues of credibility and drawing inferences from the  evidence in the record.  See Rodriquez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981) (reviewing court must defer to the judgment of the Commissioner).  The Court does not need to agree with the Commissioner's decision but only to

16

determine whether it is supported by substantial evidence.  <u>See</u>
<u>id.</u>  Finally, the court must uphold a final decision denying
benefits unless the decision is based on a legal or factual
error.  <u>See</u> <u>Manso-Pizarro v. Sec'y of HHS</u>, 76 F.3d 15, 16 (1st
Cir. 1996) (citing <u>Sullivan v. Hudson</u>, 490 U.S. 877, 885 (1989)).

    <u>2.  Claimant's Arguments</u>

Claimant argues the ALJ erred in not finding his mental
health conditions were severe, specifically his generalized
anxiety and depressive disorders and his insomnia problems.[2]
Claimant contends that the ALJ made his decision relying only the
one evaluation by Dr. Burnette, which concluded that claimant had

---

[2]In his Reply Memorandum (document no. 11), claimant changes
his argument from the ALJ erred in not finding his mental health
issues are severe at step 2 of the disability evaluation process,
<u>see</u> 20 C.F.R. § 404.1520(a)(4)(ii), to the ALJ was required to
consider even his nonsevere impairments, citing 20 C.F.R. §
404.1545(e) which deals with RFC assessments.  The record shows
that the ALJ properly considered all claimant's impairments when
he assessed his RFC after concluding he had a severe impairment
in the form of his small bowel obstructions.  <u>See</u> CR at 16
(citing 20 C.F.R. Part 404, Subpart P, App. 1, §§ 5.06
(inflammatory bowel disease) & 5.07 (short bowel syndrome)); <u>see
also</u> 20 C.F.R. §§ 404.1523 & 404.1545.  The ALJ specifically
stated that he "considered all symptoms" and gave "qualified
weight" to the September 2006 state agency medical consultant
reports which addressed claimant's mental health issues.  <u>See</u> CR
at 16-18.  To the extent claimant intends to advance this as a
new argument to justify a reversal or remand, it is untimely and
warrants no further analysis since it is undermined by the
record.

no diagnosable mental health disorder yet indicated a need to "rule out" conduct disorder, unspecified substance abuse and depressive disorder.  Claimant asserts the ALJ misunderstood Dr. Burnette's use of the phrase "rule out" to mean those conditions had been eliminated, when in fact Dr. Burnette intended that further testing needed to be done in order to eliminate those possible conditions.

To support this reading of Dr. Burnette's conclusion, claimant submits that three other psychological evaluations resulted in a finding that he suffered from anxiety, depression, adjustment disorder and insomnia associated with these mental health problems.  Those assessments were made by Dr. Connery, NP Reid and Dr. Scalese, but allegedly not considered by the ALJ or by the consulting psychologist, Dr. Schneider, who allegedly reviewed claimant's medical file before those three evaluations were added to the record.[3]  Claimant contends the ALJ erred by not considering these three assessments, citing 20 C.F.R. §

---

[3]Claimant relies heavily on Dr. Connery's diagnoses of generalized anxiety disorder, insomnia related to generalized anxiety, and mixed personality traits that include avoidance and depressive traits. He argues Dr. Schneider did not consider Dr. Connery's assessment and limited his evaluation to a review of Dr. Burnette's assessment.  Nothing in the record supports claimant's assertion that his medical file was incomplete when Dr. Schneider reviewed it.

404.1527(d), which requires every medical opinion to be evaluated in the disability determination.

Defendant counters that substantial evidence supports the ALJ's conclusions that both claimant's mental impairments and his insomnia are non-severe. Defendant explains that Dr. Burnette's use of the phrase "rule out" conveyed that he had insufficient information to diagnose the conditions. This position is actually consistent with claimant's argument, that Dr. Burnette simply concluded that further testing needed to be done to diagnose whether or not claimant suffered from the self-reported conditions. Defendant contends that if the ALJ misunderstood Dr. Burnette's opinion it was harmless, because (1) the medical evidence supports the finding that claimant did not have any mental impairment that significantly limited his ability to work; (2) claimant's life activities undermined his claimed mental impairments; and (3) claimant's failure to seek treatment for these alleged mental conditions further evinces their lack of severity. Defendant is correct.

As an initial matter, claimant bears the burden of proving he is disabled. See Picard v. McMahon, Comm. of the Soc. Sec. Admin., 472 F. Supp. 2d 95, 99 (D. Mass. 2007) (citing Santiago

v. Sec. of HHS, 944 F.2d 1, 45 (1st Cir. 1991).  To do this, he

must show "'an inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months.'"  Id. (citing 42 U.S.C. §

423(d)(1)(A)).  Claimant must demonstrate he has one or more

medical impairments of "'such severity that he is not only unable

to do his previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy. .

..'"  Id. (citing § 423(d)(2)(A)).  When, as is the case here,

claimant is not doing any substantial activity, his alleged

mental impairment must "be established by medical evidence

consisting of signs, symptoms, and laboratory findings, not only

by [his] statement of symptoms."  40 C.F.R. § 404.1508 (2008

ed.).[4]  He has not carried his burden of proof here.

    First, the record contains medical evidence to support the

ALJ's conclusion, even if he misunderstood Dr. Burnette's intent

---

    [4]Since parts 404 and 416 of Title 20 mirror one another, for
simplicity's sake I refer only to Part 404.  See Mills v. Apfel,
Comm. of the Soc. Sec. Admin., 244 F.3d 1, 2 n.1 (1st Cir. 2001).

about other mental health disorders being "ruled out."  In
reaching his decision, the ALJ relied on claimant's entire
treatment history, which did not support claimant's alleged
symptoms.  See Certified Record of the Proceedings before the SSA
("CR") at 17-18, 22, 35-36, 38 & 44 (referring to the medical
records).  Although claimant did not have any regular treatment
provider for his mental health problems, the record indicates
that NP Reid treated him most regularly and that the ALJ reviewed
and considered her records.  See id. at 35-36, 44, 89.  She twice
saw claimant for symptoms of anxiety, depression and sleep
deprivation, in May 2004 and August 2006.  See id. at 413-14 (May
2004 report) & 156-58 (August 2006 report).  In both reports, NP
Reid noted that claimant complained of anxiety, depression and
insomnia, but also noted that these symptoms were episodic,
occurring intermittently and lasting only about 1 week at a time.
She observed that claimant's affect and appearance were good,
with normal speech pattern, grossly normal memory, alert
orientation and a cooperative yet flat affect.  Id. at 413, 158.
NP Reid prescribed an anti-depressant for him in May 2004, but
claimant stopped taking the medication after a short while.  See
id. at 156 & 413.  Though a treating physician's opinion is

21

"binding on the fact finder unless contradicted by substantial
evidence," 20 C.F.R. § 404.1527(d)(2), claimant did not have a
treatment provider for his mental health problems for any period.
NP Reid's assessments were not controlling therefore, but were
considered in light of the entire record.  See id. (giving
treating physician's opinion controlling weight if it is "well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with other
substantial evidence in [the] case record"); see also Sitar v.
Schweiker, 671 F.2d 19, 22 (1st Cir. 1982) (balancing weight
given treating physician against the entire record).

     NP Reid referred claimant to Drs. Connery and Scalese, both
of whom evaluated claimant and whose reports are part of the
record the ALJ reviewed.  See CR at 22, 44, 415–16, 432–42 & 409–
10; see also 20 C.F.R. § 404.1527(c)(2) (providing for review of
consulting physicians).  Their evaluations support the ALJ's
conclusion that claimant's mental impairments did not limit his
functioning sufficiently to be considered severe.  See 20 C.F.R.
Pt. 404, Subpt. 2, App. 1 at § 12.00C (assessing severity based
on how impairment limits "activities of daily living; social
functioning; concentration, persistence or pace; and episodes of

decompensation").  Like NP Reid, the doctors found generalized
anxiety and depressive disorders with some related insomnia, <u>see</u>
CR at 409, 413 & 441, but also found claimant was not debilitated
by the symptoms.  Despite these problems, Dr. Connery also noted
that claimant had average to superior intellectual capacity and
enjoyed a wide variety of activities and interests.  <u>See</u> <u>id.</u> at
435–36 (finding claimant to be "tremendously academically skilled
in most regards").  Similarly, Dr. Scalese found that claimant's
symptoms were only moderately severe, that his appearance and
speech were normal, his affect was appropriate, and his cognitive
functions were "grossly intact with good psychological insight."
<u>Id.</u> at 409.

     The record demonstrates that the ALJ properly weighed the
opinions of these doctors and evaluated them based on several
factors, including how consistent they were with the consulting
physicians, Drs. Burnette and Schneider, and the entire record
evidence.  <u>See</u> 20 C.F.R. §§  404.1527(d)(1–6) (listing how
medical opinions are evaluated) & § 404.1520a(e)(1) (giving
overall responsibility for assessing medical severity to the
medical and psychological consultants); <u>see</u> <u>also</u> <u>Picard</u>, 472 F.
Supp. 2d at 100 (citing authority for balancing various medical

opinions); see also Frost v. Barnhart, 121 Fed.Appx. 399, 2005 WL
248161 (1st Cir. Feb. 3, 2005) (holding ALJ not required to
discuss all the evidence).  The treating and consulting doctors'
notes consistently show that despite claimant's issues with
anxiety, depression and sleep, they did not markedly impair his
appearance, affect or intellect, which are relevant indicators of
mental health.  See 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C
(listing observable behaviors relevant to assessing severity of
mental health problem).  The record is devoid of any laboratory
findings or other objective evidence to substantiate claimant's
alleged problems.  See id. at § 12.00B (describing need for
medical evidence to document mental disorders); see also 20
C.F.R. § 404.1513(a) & (b) (listing sources of medical evidence).
In reaching his decision, the ALJ specifically considered both
claimant's physical and mental impairments, see CR at 15-16, see
also 20 C.F.R. § 404.1523 (requiring combination of impairments
be considered), yet concluded they did not render him disabled.
The medical record readily demonstrates the ALJ's decision is
supported by substantial evidence.  See Gordils v. Sec' of Health
& Human Svcs, 921 F.2d 327, 329 (1st Cir. 1990) (combining the
opinions of consulting doctors to find substantial evidence).

Second, claimant's "activities of daily living," or "ADL," provided additional evidence that his mental health issues did not severely disable him.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C (listing behavioral factors assessed to determine the severity of mental impairment).  The record consistently shows that claimant was highly functional, despite not working.  He was able to care for his personal hygiene independently, to do a myriad of domestic chores, to drive and to go shopping with and without his mother, to maintain social relationships, including having a girlfriend, and to enjoy video games, computers, wrestling, fishing and reading.  The regulations specifically describe an impairment or combination of impairments as being non-severe if they do not limit claimant's ability to do basic work activities, all of which the record evidences claimant has the capacity to do and, in fact, has been doing.  <u>See</u> CR at 35-38, 168-95 (discussing claimant's activities and abilities); <u>see also</u> 20 C.F.R. § 404.1521 (describing "basic work activities" to include very simple physical and mental capabilities); <u>Goodermote v. Sec. HHS</u>, 690 F.2d 5, 8 (1st Cir. 1982) (finding no disability despite moderate depression where no evidence of "deterioration in personal habits, marked restriction in daily activities or

serious impaired ability to relate to other people.").  This
evidence of claimant's activities demonstrates he was not
significantly impaired by his mental health problems and provides
further support for ALJ's decision.  See e.g. Picard, 472 F.
Supp. 2d at 100-01 (finding no disability despite treating
physician's opinion because it was inconsistent with other
medical evidence and with claimant's ability to participate fully
in daily activities); Morales v. Sec. HHS, 976 F.2d 724, 1992 WL
240283, *9 (1st Cir. 1992) (finding no disability even though
claimant suffered from anxiety and depression because of her
mental acuity and appropriate behavior); Mandziej v. Chater, 944
F.Supp. 121, 133 (D.N.H. 1996) (considering daily exercise
regimen in assessing disability).

Third and finally, claimant's decision not to seek treatment
for any length of time further undermines the alleged severity of
his mental health disability.  See 20 C.F.R. § 404.1527(d)(1-6)
(listing factors the ALJ is to consider, including the length,
nature and extent of treatment sought); see also Giltner v.
Astrue, __ F. Supp. 2d __, 2009 WL 884748, *3 (D. Me. 2009)
(finding no disability even though signficant social impairment
where claiant sought no treatment); Gonzalez-Rodriguez v.

<u>Barnhart</u>, 11 F.3d.Appx. 23, 2004 WL 2260096, *1 (1st Cir. 2004) (same).  "'The fact that claimant did not receive *any* treatment for his mental impairment during his insured status is evidence that this impairment was not bothersome enough to require treatment.'"  <u>Id.</u> (quoting <u>Ortiz v. Sec., HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (emphasis in original)).  Claimant stopped taking Lexapro shortly after NP Reid prescribed it and took no other medications to alleviate his symptoms, which further undermines his claimed disability.  <u>See</u> <u>Tsarelka v. Sec., HHS</u>, 842 F.3d 529, 534–35 (1st Cir. 1988) (requiring not just an impairment but also a lack of any remedial treatment before disability can be found).  Dr. Connery, on whom claimant currently relies to support his claimed disability, recommended several avenues for treatment, including an Individualized Education Plan, a sleep clinic and sleep–aiding medications, and psychotherapy, <u>see</u> CR at 442, but claimant did not pursue any of his recommendations.  Two years later, in 2006, claimant told Dr. Scalese "he does not want to continue with behavioral health interventions . . . he feels he can cope with his life." <u>Id.</u> at 410.  This failure to pursue treatment undermines the purported severity of the disability, both because there is no evidence

that the alleged impairment persisted continuously for more than 12 months as statutorily required, see 42 U.S.C. § 423(d)(1)(A), 20 C.F.R. § 404.1509, and because it indicates that claimant did not perceive a need for the treatment.  See Ortiz, 955 F.2d at 769; Tsarelka, 842 F.2d at 535.

The rationale behind the final decision reflects a careful review of the entire record, and a careful assessing of credibility based on that review.  The power to resolve conflicts in the evidence lies with the ALJ, not with the doctors or the courts, see Rodriguez, 647 at 222, and he is responsible for making the ultimate determination of whether claimant was disabled.  See 20 C.F.R. § 404.1527(e); see also Pariseau v. Astrue, __ F. Supp. 2d. ___, 2008 WL 2414851, *4 (D.R.I. 2008) (citing authority).  I do not find that the ALJ ignored any critical factual or legal issue when issuing the final decision. When, as is the case here, there is a substantial basis in the record for an ALJ's decision, the court must affirm the decision, whether or not another conclusion is possible.  See Ortiz, 955 F.2d at 769.

**CONCLUSION**

While claimant may very well have experienced some anxiety and depression since September 2005, and certainly suffered from small bowel problems which have caused him some discomfort and disruption in daily activities, the evidence of record supports the conclusion that his combination of impairments did not cause him sufficient functional limitations to require a finding of disability.  I cannot find any basis to remand or reverse and, therefore, recommend that claimant's Motion for Summary Reversal of the Decision of the Commissioner (document no. 7) be denied, and that respondent's Motion for an Order Affirming Decision of the Commissioner (document no. 8) be granted.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

29

```
Date:        April 24, 2009

cc:          Francis M. Jackson, Esq.
             Gretchen Leah Witt, Esq.
             United States Social Security
               Administration
```